The opinion of the court was delivered by
Watkins, J.
This is a proceeding by mandamus to compel the Governor, and the Register of the State Land Office, to execute and deliver to the relator patents for certain lands; and to require the former to transfer and deliver to him a certain swamp land indemnity certificate.
In the court below there was judgment making the mandamus peremptory as to the Register, commanding him to prepare and sign patents in favor of the relator, for lands recovered by him as per his contract with the State of Louisiana; which lands were divided by lot by said Register, on the 4th and 5th of February, 1889; but no disposition was made of the demand for a mandamus to the Governor, *210 aside from the general statement that the law and evidence were in favor of the relator, “ entitling him to the decree prayed for.”
From that decree the respondents have appealed, and, in this, court, the relator has filed an answer, praying that the judgment against the Register be affirmed; but, in so far as relief by mandamus against the Governor is concerned, the case remains in statu quo, and an affirmance of the judgment is all he could require.
I.
The claim of the relator is, that by the terms of Act 23 of 1880 tho-Governor was authorized to employ counsel to assert the rights of the State to lands donated to the State by the Federal government, or to recover the value of said lands in money or scrip; and that on the 20th of March, 1880, the Governor did make and enter into a contract with him for the purposes enumerated in and contemplated by that act. That, in pursuance of and conformably to said act and contract, he recovered for the State of Louisiana two indemnity swamp land certificates from the general government, covering over 1200 acres of land; and, also, recovered certain internal improvement and school indemnity lands, which had been granted the State under various acts of Congress, a schedule of which is appended to his petition.
That all of said lands were, by the Register, divided by lot, into two parcels, one of which was allotted to him and the other to the State, and of the whole he caused an act of partition, in due form, to be prepared — the internal improvement and school indemnity lands being therein separately mentioned — showing the quantity and description of those lands to which he was entitled, as well as those allotted to the State.
That he is entitled to the share of said lands thus allotted to him on the Register’s projet of partition, and to one of the two indemnity swamp land certificates, they having been issued by the land officers-of the Federal government in two equal portions, the patents for the whole of said lands and said certificates being in the custody and control of the Register of the State Land Office, and notwithstanding due demand had been made upon the Governor to that effect, he has declined to sign the necessary patents, or to transfer to him either of said indemnity swamp land certificates; and said refusal of the Governor to sign and deliver said patents as evidences of title, and to- *211 transfer and deliver said certificate, and the declination and refusal on the part of the Register to perform his duties in the premises, are contrary to law, and if persisted in, will result in great loss and injury to him, and that mandamus affords the only remedy and relief.
The defences assigned for the Governor — who makes appearance through the Attorney General — are as follows, viz:
That, as the chief of the executive department of the State government, he “gives the court to know and be informed that he is. ready and prepared to do and perform any and all duties which devolve upon him under the Constitution and laws of the State, when the facts of any given case justify; but that, in respect to the matters and things set forth in the relator’s petition, no such duty devolves upon him, and he has declined and declines to act in the premises, as matters now stand.”
That the Register questions “ his right and authority to take action in the premises, and because he had also been informed that the lands mentioned were lands held in trust by the State for school purposes, and could not be diverted by the Legislature, or the State, directly or indirectly, to any person, and especially, as was attempted to be done ” in this case; that he approves of the opinion expressed' by the Register, and of the final action of “the Register in refusing to sign said patents, and he declares that his prior action was unwarranted.”
That' the Register had, and has, no legal authority or capacity under Act 28 of 1880 to pass upon the contract entered into between his predecessor in office and the relator, and decide whether said contract was justified by said statute or was within its terms, and a legal contract; and had neither authority to examine into the services of the relator and determine whether they were within the law and the contract, nor to approve same and make a partition, or other disposition, of the lands recovered by him thereunder.
That the Register is utterly' without authority, either to audit said matters or stand in judgment, in respect to same, for the State.
That he — the Governor — “ is without any authority or capacity to audit the said claim, or to make any disposition of the scrip or land in favor of the relator, or any one else — and he declines to do so — or to stand in judgment for the State, and he declines to do so.
‘ ‘ That this whole matter will require additional legislation, in that, until.such additional legislation, and some remedial and enabling act *212 (is passed), no action whatever can be had by either the executive or judicial department” under said act and contract, “for the purpose of ascertaining and fixing the rights and obligations of the parties.”
“ That the only authority given to the Governor, under Act 23 of 1880, extended to making a contract for the purposes mentioned, and not to auditing any claims or rights under it, or standing in judgment for the State under it.” (Italics ours.)
“ That he in no manner recognizes or admits that the claims and pretensions- of the relator are just, or well-founded, either in law or in fact; and he deems it his duty, as head of the executive department, to inform the court, and bring to its knowledge the matters and things herein set forth, to the end that the State suffer no injury,” etc.
The answer of the Register is of like import, and it adopts the averments of that of the Governor as his own.
This extended statement of the demands of the relator and of the defences of the respondents was deemed essential .to the perfect -elucidation of the questions involved.
II.
The substantia] facts adduced on the trial are set out in certain admissions of record and the parol testimony of relator. They are as follows:
1. The admissions are to the effect “that the lands described in the advertisement embrace the school indemnity and the internal improvement lands recovered, and the lands allotted to the relator are correctly described in the petition.
“ That the swamp land indemnity certificates described in the petition, on which the relator claims a fee under his contract, were recovered for the State in two certificates of equal amount, and that the transfer and delivery to him in negotiable form, by the Governor, of one of these certificates, will be payment for said recovery if this action is warranted.”
“That the said school indemnity and internal improvement lands were received by the relator, acting under his contract with Governor Wiltz.
“That the Register of the State Land Office divided, and,-on February 4 and 5, 1889, allotted to the relator, as his fee for recovery of ame, the lands so claimed and described in his petition.”
*213 “That frequent demands for patents for the lands, and the transfer of the scrip accruing to the relator have been'made on the Governor and the Register, and (such demands) have been refused.”
2. The testimony of the relator as a witness is to the effect that,, by the terms of Act 85 of 1848, the State assumed control of the school lands granted to the State by certain acts of Congress, by imposing upon the Register-of the State Land Office, the duty of adjusting the grant, and by authorizing him to sell school land warrants when deficiencies were ascertained.
Under ■ the provisions of that act, and prior to 1861, about 115,000 acres of such warrants had been sold, and it was generally conceded that the State could make no further claim under said act of Congress, dated May 20, 1826.
“ Such was the supposed condition of the school grant at the date of the passage of Act 28 of 1880.”
“In pursuance of the contract thereunder, relator entered upon an examination of the records with the view of determining the status of the grant, but they were found so defective that it became necessary to form tabulated statements of all the warrants issued by the State.”
The records of the Land Office of the United States were then examined.
“In performing this work, lists were found on the files, then not recorded in the State Land Office, and plats were found which were not found in the Surveyor General’s office, and viceversa. It required much time and correspondence to perfect the list referred to owing to the obstacles encountered.
“Application was next made to the Register of the State Land Office to issue warrants for deficiencies, but he refused for the reason that he was not advised as to whether such townships were entitled to indemnity.”
The next step taken was to ascertain where the best government lands, subject to location by the State, were situated, and this was done at great labor and expense to the relator, and lists were made and forwarded to the General Land Office for instructions, which were, after considerable delay, approved and returned to the local Land Office of the United States, with instructions to receive the same.
“So many difficulties were encountered in the various steps of the *214 adjustment * * * that the relator was obliged to secure the aid of experts, both here and in Washington, at great expense.”
Finally, it is stated that prior recoveries were obtained by him during the administration! of Governors Wiltz and McEnery, and the Register of the State Land Office made partitions between the State and himself, just as the Register proposed in this instance.
The act of the Legislature under which the relator’s contract was made, as well as the contract, were put in evidence. No evidence was introduced on the part of the respondents.
The following is an exact copy of Act 23 of 1880, viz:
AN ACT.
‘‘ Authorizing the Governor of the State of Louisiana to employ counsel to assert the rights of the State to lands donated to the State by the Federal government, or to recover the value of said lands in money or scrip.
“Section 1. Be it enacted, etc., that the Governor of the State be and he is hereby authorized to take the necessary steps to institute proceedings, to employ counsel and to make necessary agreements to recover for the State the lands situated in the State of Louisiana, and donated by several acts of Congress to the State for divers purposes ; some of which have been illegally disposed of by the Federal government, and other portions, though listed to the State, have been improperly suspended, or rejected by the Federal government, and the approval to the State refused, or to recover the value of said lands, in money or government scrip; provided that the State shall incur no cost or expense in the prosecution of said claim, other than the allowance to be made by the Governor out of the land’s money, or scrip, that maybe recovered. The Governor is specially authorized to make all agreements and contracts to carry out the provisions of this act.”
This act was signed and approved on the 8th of March, 1880, and duly promulgated thereafter.
On the 20th of March following, Louis A. Wiltz, the then Governor of the State, entered into a written contract with the relator, in which the following, among other stipulations, are found, viz:
First: ‘ ‘ That the relator promises and agrees to employ his diligent and best efforts to recover for the State, all lands donated to her by the general government as swamp lands, and which have been *215 improperly suspended, or rejected by the United States government; and all lands to which the State had valid claims, and which have been sold or otherwise disposed oí by the United States, to the prejudice of the State, or to recover the value of lands in money or scrip, to be paid, or issued by the United States, in lieu of lands sold, or otherwise disposed of by the government of the United States, to which the State had valid claims, including therein the claims of the State upon the general .government for lands, or their value, for school purposes; for the amounts in money due the State by virtue of the Acts of Congress in relation to military bounty land warrants, or their location, and also for internal improvement purposes.”
Second: “The State of Louisiana on her part agrees to pay John McBnery fifty per centum of the lands, money or scrip recovered, to be paid as provided in said Act 23.
“ Where lands in kind are recovered, the compensation, as aforesaid, of the said McEnery shall be represented in scrip or certificates, to be issued by the Register of the Land Office of the State, and locatable upon any lands owned by the State.”
It was thought to be most convenient and correct to incorporate the statute, and the contract made in pursuance of it, with the statement of facts, and deal with them as parts of the evidence, as they were introduced as such and are the foundation of the relator’s rights.
III.
Inasmuch as the principal question discussed in the Attorney General’s brief is that the school indemnity lands, for a portion of which the relator makes claim, are not the property of the State, but only held in trust by the State for school purposes, and for that reason same can not be transferred to him, and the Legislature was without power to authorize the sale or partition of them as proposed; we will examine that proposition first, as it underlies the statute in pursuance of which relator’s contract was made, and, if sustained, will invalidate much the greater part of his demands.
The syllabus of his brief presents his theory in very concise form and we quote it in full, viz:
“ Act No. 23 of 1880 applies only to recovery of State lands. State lands are those in which the title of the State is absolute.
“Lands donated to the State for school purposes are not State lands but lands held in trust by the State.
*216 “ Lands donated to townships are for the benefit of the particular township and the Legislature can not divert, nor authorize the Gov-^ ernor to partition them even under a contract for their recovery.
“ If such authority existed in the Legislature, the costs and commission for the recovery of school lands should be equitably divided among all the townships to the extent of the benefits secured.”
His further contention is that the terms of the contract, in so far as they appertain to school lands, are ultra vires, and not covered by or contemplated in the statute and are therefore void.
Relator’s answer to this proposition is that the lands in question, a portion of which he claims, are not sections sixteen in place, but are lands granted by the United States government to the State as indemnity for the benefit of the inhabitants of the township where sections sixteen are wanting or deficient for any cause; and that in recovering said lands from the United States, his fees are charged in pursuance of the statute and his contract upon them as a whole.
That the lands recovered are not sixteenth sections, but those which have been selected and located Without any reference to sixteenth sections, and which were granted in lieu of those to which certain townships were entitled under acts of Congress malting donations, and not secured to, or received by them. The recovered lands do not belong to certain townships, eo nomine, but to the State — in trust for school purposes, if you will — and must, ultimately, be sold by the State, so that the proceeds thereof may be placed to the credit of the people of the respective townships entitled to participate therein. Those lands were surrendered to the State by the land department of the general government, as a matter of equity, in order to carry out in good faith the provisions of the donation which had not become entirely effectual, because of conflicting or prior entries of some portions of the area donated.
An examination of the Register’s projet of partition discloses that there is not a single sixteenth section contained in it; and the testimony otherwise shows that the relator’s theory is true. The lands recovered are not school lands, but, as described, indemnity lands, destined to school purposes, the legal title to which is in the State, charged, however, by the terms of the contract and the statute under which they were recovered, with the compensation fixed in behalf of the relator.
*217 The act of 1880 is in keeping with the general law, State and Federal, on the subject.
Sec. 2951 of the Revised Statutes declares that:
‘ ‘ The Register of the State Land Office is required to ascertain in what townships in this State there are no reservations of school sections by reason of conflicting claims, or from any other cause, or when the reservation is less than contemplated by law; and in such cases it is made his duty, under the superintendence of the Governor, to apply for and, as soon as possible, obtain a location of any land or parts of land in lieu thereof.”
Sec. 2592 provides that:
“ When such locations can not be made, if deemed more advantageous to the State, the Register, with the assent of the Federal government, is authorized to issue scrip for such lands, which scrip shall not be sold for a less amount than $1.25 per acre.”
These sections are in the exact language of Secs. 8 and 9 of Act 316 of 1855, “regulating the sale of internal improvement and school lands.”
From these provisions it clearly appears that it was, at the time of the passage of that act, within the contemplation of the Legislature, that there were many townships wherein there were deficiencies in school reservations, and hence a special mandate was delegated to the Register of the Land Office, “under the superintendence of the Governor,” in the premises.
While it is true that the act of 1880 does not, in terms, mention school lands or school indemnity lands, yet we are of opinion that those employed, viz, “lands situated in the State of Louisiana, and donated by several acts of Congress to the State for divers purposes, some of which have been illegally disposed of by the Federal government, and other portions, though listed to the State, have been improperly suspended or rejected by the Federal government, and the approval to the State refused, etc.,” are equally distinct and efficacious, when considered in the light of the antecedent statutes on the same subject. And when taken in the light of history, and the evidence in the record, the principal object in view was, evidently, the recovery of those identical lands, for it is apparent that notwithstanding the requirements of the act of 1855, no recoveries of consequence had been effectuated, and hence the necessity for the State to secure the assistance which was obtained.
*218 Iii addition to these considerations, the laws of Congress under which the donations were made, the acts of May 20, 1826, and February 26, 1859, especially provided for such indemnity, and are the foundation of the State laws referred to. Those acts were, by the revision of the statutes, merged into Secs. 2275 and 2276 of the United States Revised Statutes, in December, 1873, which repealed all antecedent laws on the same subject matter.
We quote Sec. 2275. It is as follows, viz:
“Where settlements, with a view to pre-emption, have been made before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the pre-emption claim of such settler; and if they, or either of them, have been or shall be reserved or pledged for the use ■of schools or colleges in the State or Territory in which the lands lie, other lands of like quantity are appropriated in lieu of such as may be patented by pre-emptors; and other lands are also appropriated to compensate deficiencies for school purposes, where sections sixteen or .thirty-six are fractional izn quantity, or when one or both are wanting by reason of the township being fractional, or from any natural cause whatever.'1’ (Our italics.)
The State assumed control of school lands donated under the acts ■of Congress, and, on the 20th of December, 1848, the General Assembly enacted a statute “.to secure the location of school lands.” To that law the act of 1855 is a supplement, and it fixed the price at which school lands should be sold, the authority for their sale having-been specially delegated to the State, by the Act of Congress of February 15th, 1843. See Statutes at large, Yol. 5, p. 600.
The question as to legal destination of the title to school indemnity lands has been determined by this court, in several well-considered opinions, of recent date.
In Board of School Directors of Concordia vs. Ober, 32 A. 418, our predecessors disposed of the whole question in one short paragraph. They say:
“ These lands were donated by Congress to this State for public school purposes. By act of February 15, 1843, the Legislature was authorized by Congress to provide for the sale, and the conveyance of a fee simple title to the purchaser; and the manner of sale and disposition of proceeds was prescribed by our legislative acts of 1855. The State is a trustee of the lands, or the proceeds of their tale, for the *219 use of the inhabitants of the townships wherein they are located.” (Italics ours.) This statement is consonant with that announced by us in Bees vs. Louviere, 87 An. 738, in which we held:
<{ It is clear that, when the State sold the indemnity warrant, she parted with what right, title and interest she had, or could have had, in and to any part of the public domain to which she would have been entitled by the location of the warrant; and that, when the location was effected, approved, returned, and acted upon by the delivery of the patent by the Governor, the divestiture was complete.” (Italics ours.)
It was so held in effect, in McCastle vs. Chancy, 28 An. 720; in Bradley vs. Case, 4 Illinois 604 (interpreting similar statutes) ; and in Cooper vs. Roberts, 18 Howard 181. In this last case, the Supreme Court expressed the opinion that “ the trusts created by these compacts relate to a subject certainly of unusual interest (and) of municipal concern, over which the power of the State is plenary and exclusive.”
The foregoing is deemed perfectly conclusive as to the legal title of such lands being in the State, with the right of sale, and of making perfect and complete titles to purchasers from her, and the right of dedicating the proceeds of sale to the inhabitants of such townships as may be entitled thereto.
On account of the great public importance of the question involved and the stress laid upon it in the argument of the Attorney General, we have dealt with it as res nova and examined it most carefully and thoroughly, and our conclusion is that the statute is broad enough and sufficiently ample in terms to authorize the contract in this respect between the relator and the Governor; that the laws of Congress, and the prior statutes of the State authorized the recovery and selection of the indemnity school lands; that the right existed in, and the duty was imposed upon the State through appropriate legislative action, to make sale of them and dedicate the proceeds to school purposes; and that the authority in the Legislature to confer upon the Governor the power to convey a part of said lands, when recovered, to such person as should aid in their restoration to the State, is likewise ample.
In so far as the right of the relator to a part of the internal improvement lands recovered and to one of the two indemnity swamp land certificates are concerned, there is nothing said by the Attorney *220 General, and it must turn upon the theory that the Governor is-wholly without authority in the premises to stand in judgment for the State, or at least until additional legislative action is had in the premises.
IV.
Recurring to the answers of the respondents, we observe that seeming stress is laid by the Attorney General upon the alleged want of authority on the part of the Governor, as well as of the Register of the State Land Office, to stand in judgment for the State. This, we consider, a misconception of the issues involved in this case. In no proper sense is the State a party to this suit, and no judgment or relief is asked for against her. For, if such were the case, this proceeding would have to go out of court immediately, for it is a familiar principle “that the sovereign can not be sued, in his own courts, without his consent.” State vs. Burke, 34 An. 548; State ex rel. Attorney General vs. Lazarus, 40 An. 858; Louisiana vs. Jumel, 107 U. S. 728.
And no such consent is averred in this case. In our conception, this is a suit, or proceeding by way of the extraordinary remedy of mandamus, taken on the part of a private citizen against the chief executive officer of the State government, and against one of the subordinate officers of that department, for the purpose of obtaining specific relief by coercing them to carry out and complete a contract in the ordinary form, which he had entered into with the predecessor of the respondent Governor; upon the completion and fulfilment of which said citizen, as relator, has large and valuable interests depending ; and in the performance of which a specific duty was imposed upon the Governor by a special act of the Legislature; and wherein he was wholly without discretion.
The denial of right on the part of the Governor and on the part of the Register rests upon like grounds, and involve like principles of law, because they are both executive officers of the State government ; and, while there is no specific denial of the jurisdiction of this court to pass upon and decide the question thus raised, yet there are averments to the (effect that the duties imposed upon them, if any, come clearly within the definition of executive acts which, so far as they devolve upon the Governor, are within the exercise of his discretion, and therefore their performance can not be coerced by mandamus.
*221 Preliminary to the discussion of this question, we will say that we regard the act in question as sufficiently complete, and concise, to cover the case in hand. We can not discover any necessity for additional legislationin order to the complete execution of the relator’s contract; at least so far as the Register is concerned, and, if indeed the same is ultra vires on the part of the Legislature — though we do not think it is — from what source could the vires be obtained, if not from the Congress? In so far as the performance on the part of the relator, of all the requisites antecedent, and necessary, to entitle him to compensation under his contract, is concerned, there is cpmplete proof in the record, and it consists in an admission “that the' lands described in the advertisement .embrace the school indemnity lands and the internal improvement lands recovered.”
Those lands were doubtless patented to the State, and the Register of the State Land Office is in possession of them. After their surrender into the power and possession of the Register, no further or other duty was imposed upon the Register than merely to partition or allot the recovered lands, as he proposed to do; and no other or further duty devolved upon the Governor than that of signing and delivering patents to the relator for the portion of said lands to which he was entitled, as he is requested to do. In their answers there is no charge of illegality in relator’s contract, or want of due compliance on his part, with all of its terms and requirements. Neither is there any charge of unconstitutionality of the law under which it was made. Therefore, neither of the respondents are called upon to examine and pass upon this contract in any way, or in any way to pass upon the law. Neither of them are requested, or charged with the duty of examining into the services of the relator, in the premises; or, if determining whether they are within tlie contract and the law, and of approving the same. The law directed the Governor to do a certain specific thing, viz: “ to take the necessary steps to institute proceedings, to employ counsel, and to make the necessary agreements to recover for the State certain lands.” To this end he was authorized to make an “allowance * * * out of the lands, money, or scrip * * recovered,” to the attorney employed. In the contract the allowance was fixed at “fifty per centum of the lands, money, or scrip recovered.”
The contract stipulates that this allowance is to be paid as provided in Act 23 of .1880, and it provides that the Governor is spe *222 cially authorized to make all agreements and contracts necessary to carry out its provisions.
While the question of mandamus going to the Governor has been practically eliminated from the case, the relator’s right to the writ, as against the Register, is still insisted upon; and as these are duties which are specifically imposed upon him by law, in the premises, we must ascertain whether or not they are ministerial.
Neither the general provisions of law, nor those of the particular statute in question, confer the power or make it the specific ministerial duty of the Register to sign patents to land. The law has imposed that duty on the Governor. R. S. 2920, 2983; Sec. 2, Act 316 of 1855.
We do not understand this to be a proceeding to enforce by mandamus an ordinary contractual obligation. For that purpose the writ would not lie. State ex rel. New Orleans vs. Carrollton Railroad Company, 37 An. 589. The rights which relator seeks to enforce flow out of Act 23 of 1880, by the terms of which the Governor was selected as the mandatory of Legislature to carry its will into effect.
Without legislative authority he would have been absolutely powerless to enter into any contract in the premises with relator or with any one else. In stipulating with relator the Governor was merely the agent of the General Assembly as the contracting party, and in whose stead it could with equal propriety have selected any other person. Hence the relief herein prayed for is simply the execution of the legislative will, and for which — in respect to the Register of the State Land Office — mandamus is an appropriate remedy. For it is elementary that he is charged with the performance of all duties which precede and are prerequisite to the sale of public lands and the issuance of patents therefor.
The general law of the State imposes on the Register the specific duty of ascertaining in which particular townships there were no reservations, or in which there were deficiencies, and “under the superintendence of the Governor ” to apply for and secure the location of other lands in their stead. R. S., Sec. 2951.
Act 23 of 1880 charges that officer with the duty of issuing scrip, or certificates, to such person as may be employed by the Governor in pursuance of its provisions, for the amount of his compensation when lands are recovered in kind. Inasmuch as the relator has obtained from the land department of the general government patents *223 to the State for the whole of the lands in question, and under the very letter of his contract he is entitled to half, no argument is necessary to show that it was the Register’s duty — plain and ministerial —to prepare all the data and perform all the acts incident and prerequisite to the issuance of patents therefor, as the evidence of relator’s right is perfect and complete; and, to that end and effect, his-right to a mandamus is also complete.
Whatever contrariety of opinion may have, at onetime, existed on the subject, it is now a settled principle that a peremptory mandamus will go to State officers, such as Auditor, Treasurer, and Register of State Land Office, for the purpose of coercing performance of purely ministerial duties devolving on such officers by law.
In State ex rel. Collins vs. Jumel, Auditor, 30 An. 863, our predecessor said on this subject:
“ The State is sovereign, and can not be sued by her citizens, in her own courts, without her permission, bnt a civil proceeding, by which one officer of the State seeks to compel another officer of the same State to perform a ministerial duty, is not, in the proper sense of the words, a suit against the State.
“Nothing is more common than for a party who has a claim against the State, whether for salary as an officer, or for money due on other accounts, to have his right to payment adjudicated through and by means of a mandamus against the auditing officer. It is recognized by us as a legitimate mode of ascertaining what are the rights of persons who have or who prefer claims against the State.”
In State ex rel. Ecuyer vs. Burke, Treasurer, 33 An. 969, we said that “ while fully recognizing the independence and all the rights-of coordinate branches of the government, it is only necessary to say that it is the province of the judiciary, whenever the question is properly brought before it in judicial proceedings, to decide whether duties sought to be enforced at the hands of officers are or are not ministerial, and that it is of the essence of the judicial power to adjudge such questions,” etc.
In keeping with this recognized principle w.e made mandamus peremptory in State ex rel. Campbell vs. Steele, Auditor, 37 An. 353.
Our predecessors did likewise in State ex rel. Mentz vs. Clinton, Auditor, 28 An. 47; and in State ex rel. New Orleans Republican Printing Company vs. Clinton, Auditor, 28 An. 72.
These decisions are in line with those pronounced in Marbury vs. *224 Madison, 1 Cranch 137, Kendall vs. United States, 12 Peters 608, and Board of Liquidation vs. McComb, 92 U. S. 541. Indeed, the Attorney General has made no question as to our authority, in this respect.
The District Judge entertained this view and made the mandamus peremptory as to the Register, and we think correctly.
Judgment affirmed.
Mr. Justice MeEnery recuses himself on account of relationship to the relator.